J-S85032-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MEHRNOSH MASSERRAT | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| ESMAEEL MASSERRAT, | : | |
| | : | |
| Appellant | : | No. 186 EDA 2016 |

Appeal from the Order enteredDecember 18, 2015
in the Court of Common Pleas of Leigh County,
Civil Division, No(s): 2006-FC-1453

BEFORE:  PANELLA, RANSOM and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                **FILED February 27, 2017**

Esmaeel Masserrat ("Husband"), *pro se*, appeals from the final Order

equitably distributing the parties' marital assets.  We affirm.

In its Memorandum Opinion filed on July 14, 2016, the trial court

described the factual history underlying the instant appeal as follows:

> [Husband and Mehrnosh Masserrat ("Wife")[1]], Iranian
> citizens, had separated on October 25, 2006, just two months
> shy of their twenty-first wedding anniversary, having married
> [on] December 30, 1985…. It was the first marriage for each of
> them.  At the time of the marriage, Husband was employed as
> an electrical engineer and Wife was a college student.  The
> marriage produced two children, both of whom have reached the
> age of majority.
>
> Wife was born on July 29, 1961, and thus she is now fifty-
> four years of age.  Husband is approximately fifty-five years of
> age.  Husband is still an electrical engineer.  Wife has an
> associate[']s degree in business, a bachelor's degree in
> accounting, and obtained a Master[']s Degree in Business
> Administration after separation.  Throughout the course of this

---

[1] Wife also is appearing *pro se* in the instant appeal.

litigation, both [H]usband and [W]ife have had periods of unemployment and different employers….

At the time of the 2009 hearings in front of the Divorce Master, [W]ife had an existing health condition and a lack of formal work experience[,] which the Master found would give Husband a superior ability to earn income and to acquire assets in the future. Husband contributed to Wife's education[,] paying for her accounting classes at Mulhenberg College in exchange for Wife cooking, cleaning, cutting the grass, and everything else. Husband's approximate annual income[,] when he was employed by LSI[,] was $125,000 a year. The Lehigh County Domestic Relations Section determined the parties' net monthly incomes to be $7,100 for Husband and $2800 for Wife. At the time of separation, … Wife was caring for dependent minor child[,] N.M.[,] at the marital residence.

Trial Court Memorandum Opinion, 7/14/16, at 6-7 (footnote added).

In its Memorandum Opinion, attached to the trial court's Pa.R.A.P. 1925(a) Statement, the trial court details the protracted procedural history, which we adopt for the purpose of this appeal. *See* Trial Court Memorandum Opinion, 7/14/16, at 8-11. The court filed its final Order, equitably distributing the parties' marital assets, on December 18, 2015. Husband, *pro se*, timely filed a Notice of Appeal, followed by a Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Husband presents the following claims for our review:

(1) Can the Master of divorce/[trial] court ["Master"] disregard official documents being delivered to the court (on several occasions) and give $25,000[] credit to [Husband] as the value of [a] joint stock account at separation date, based solely on hearsay?

(2) Can the [trial] court give [Wife] $62,000[] credit for paying down the [m]ortgage while the following condition[s] appl[y]:

- [Husband] is denied his rental portion of the marital home since [the parties'] separation date of Oct. 25, 2006.

- [Husband] is forced out of the marital home[,] yet he is required to pay full support[,] which included additional mortgage deviation to [Wife.]

Is there a legal obligation to pay support and mortgage deviation[,] but no rights for [Husband] in this case?

(3) Can the Master/[trial] court deny [Husband the] [f]air [r]ental [c]redit for his portion of the [m]arital [h]ome based solely on [an] unsubstantiated statement of abuse (as determined by court actions) as well as ignoring the terms of the [Protection from Abuse Act[2] ("PFA") Order] signed by both parties?

(4) What justice is served when [the trial] court disregard[ed] [Pa.R.C.P.] 1910.16-6 and force[d] [Husband,] who has been evicted from [the] marital home, to take [on the] burden of paying 55% share of [the] marital home [r]eal [e]state [t]axes[,] amounting to $23,000[]?

(5) Can the [trial] court force an appraisal on the marital home, in spite of objections by [Husband] as to how the appraisal is done, and put a value on the marital home that is about $100,000[] below the market value of the home?  And then deny [Husband] from purchasing the [m]arital [h]ome at the appraised value?  Isn't this self[-]evident, and therefore[, an] abuse of [d]iscretion, that [the] appraised value is unfair?

(6) Are witnessing of 5 people [*sic*] … as to [the] existence[] of valuable Persian carpets in [the] marital home, not a preponderance of evidence against [the] sole witnessing of one person, [Wife]?

Brief for Appellant at 6-8 (emphasis and some extraneous argument omitted, footnote added).

---

[2] ***See*** 23 Pa.C.S.A. §§ 6101-6122.

Our review of an award of equitable distribution is guided by the following principles:

> A trial court has broad discretion when fashioning an award of equitable distribution. ***Dalrymple v. Kilishek***, 920 A.2d 1275, 1280 (Pa. Super. 2007). Our standard of review when assessing the propriety of an order effectuating the equitable distribution of marital property is "whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure." ***Smith v. Smith***, 904 A.2d 15, 19 (Pa. Super. 2006) (citation omitted). We do not lightly find an abuse of discretion, which requires a showing of clear and convincing evidence. ***Id.*** This Court will not find an "abuse of discretion" unless the law has been "overridden or misapplied or the judgment exercised" was "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record." ***Wang v. Feng***, 888 A.2d 882, 887 (Pa. Super. 2005). In determining the propriety of an equitable distribution award, courts must consider the distribution scheme as a whole. ***Id.*** "[W]e measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights." ***Schenk v. Schenk***, 880 A.2d 633, 639 (Pa. Super. 2005) (citation omitted).

***Childress v. Bogosian***, 12 A.3d 448, 455 (Pa. Super. 2011) (quoting ***Biese v. Biese***, 979 A.2d 892, 895 (Pa. Super. 2009)). "We are also aware that a master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties." ***Morgante v. Morgante***, 119 A.3d 382, 387 (Pa. Super. 2015) (citation omitted).

- 4 -

Husband first claims that the trial court abused its discretion in valuing his joint stock account, as of the date of separation, at $25,000. Brief for Appellant at 16-18. In support, Husband challenges the transcription of numbers in the October 16, 2009 Notes of Testimony. *Id.* at 17. Husband further asserts that the Master merely picked one statement by Husband, out of several, while ignoring other documentary evidence.[3] *Id.* at 18.

In its Memorandum Opinion, the trial court addressed this claim, and concluded that it lacks merit. *See* Trial Court Memorandum Opinion, 7/14/16, at 16-20. Upon our review of the parties' briefs and the certified record, we agree with the sound reasoning of the trial court, as expressed in its Opinion, and affirm on this basis with regard to Husband's first claim. *See id.*

In his second claim, Husband argues that the trial court improperly credited $62,000 to Wife, for mortgage payments made by her. Brief for Appellant at 19. Husband claims that he,

> alone[,] made all contributions to maintaining the marital property while living together[,] and made substantial contributions to preserving the marital estate even after separation, given that he was charged with a mortgage deviation of around $450[] dollars per month (modified a few times) for about 4 years in the related domestic relations [O]rder from Oct[ober] 2006 [until] March 2010[,] when the Home Equity loan was paid off.

---

[3] Although "hearsay" is mentioned in the Statement of Questions Involved, there is no legal argument challenging the admissibility of hearsay evidence in the Argument section of the brief.

*Id.* (citation omitted). Husband contends that the lack of a fair rental credit to the dispossessed spouse is an unfair enrichment to the possessing spouse, at the expense of the dispossessed spouse. *Id.* at 22. Husband further argues that the trial court improperly ignored evidence that he has been paying a mortgage deviation on the property, as part of his support obligation to Wife. *Id.* Husband asserts that an unfair burden is placed on him, as he is forced to share in paying the real estate taxes on the marital home, during the time that a PFA Order was in effect. *Id.*

In its Memorandum Opinion, the trial court addressed this claim and concluded that it lacks merit. *See* Trial Court Memorandum Opinion, 7/14/16, at 20-23. We agree with the sound reasoning of the trial court, as set forth in its Memorandum Opinion, and affirm on this basis with regard to Husband's second claim. *See id.*

In his third claim, Husband argues that the trial court improperly denied him a fair rental credit for his portion of the marital home, "given that he had to rent separate living quarters." Brief for Appellant at 23. Husband contends that Wife's claim of abuse "was totally unsubstantiated and the [a]ssault case against [Husband] was dropped by the action of [the district attorney,] and this fact has been ignored by the trial court." *Id.* at 24.

In his fourth claim, Husband asserts that the trial court improperly denied him a fair rental credit, in violation of Pa.R.C.P. 1910.16-6. *Id.* at

24-26. Husband argues that based on Pa.R.C.P. 1910.16-6, especially where his has not been given fair rental credit, "the tax expenses are solely [Wife] alone and [Husband] should be given 100% credit for the money removed from [a] frozen account to pay [r]eal [E]state taxes." *Id.* at 26.

In its Memorandum Opinion, the trial court addressed these two claims and concluded that they lack merit. *See* Trial Court Memorandum Opinion, 7/14/16, at 23-29. We agree with the sound reasoning of the trial court, as expressed in its Memorandum Opinion, and affirm on this basis as to Husband's third and fourth claims. *See id.*; *see also Lee v. Lee*, 978 A.2d 380, 388 (Pa. Super. 2009) (recognizing that "in divorce-related equitable distribution, when a spouse has been excluded from the marital home by a [PFA] order, the other spouse may raise an equitable defense against the first spouse's claim to rental credit for the time period in which the order was in effect.").

In his fifth claim of error, Husband argues that his right to a fair appraisal and appeal process was violated when the appraisal was conducted in his absence. Brief for Appellant at 26. Husband contends that he was not informed that an appraisal had taken place until a copy of the appraisal was handed to him in court. *Id.* Once again, Husband points out that Wife did not make a single mortgage payment while the couple lived together. *Id.* Husband further contends that he was not afforded an opportunity to challenge the appraisal, which was $100,000 below an estimate on

Zillow.com, an online real estate marketplace. *Id.* at 27. Husband also asserts that the trial court denied him the opportunity to purchase the house at the appraisal price. *Id.*

The trial court addressed this claim in its Memorandum Opinion, and concluded that it lacks merit. *See* Trial Court Memorandum Opinion, 7/14/16, at 29-34. We agree with the sound reasoning of the trial court and affirm on this basis as to Husband's fifth claim. *See id.*

Finally, Husband challenges the trial court's valuation assigned to the parties' personal property. Brief for Appellant at 28. Husband claims that he "should be entitled to at least $50,000 for the personal property that was in Wife's sole possession[,] instead of [the] mere $2500[] credit given to him for everything in the marital home." *Id.* Husband directs our attention to testimony by him, his children and his expert that the home "was expensively furnished with valuable original Persian carpets[.]" *Id.*

The Master's Report states the following, with regard to the Persian carpets:

> 14. The testimony offered by both parties as to their Persian rugs/carpets was confusing and lacking in substantial credibility.
>
> 15. The expert offered by Husband as to the value of the rugs/carpets, [] Tahir, clearly was biased against Wife for whatever reason, and her testimony has been discounted in its entirety.
>
> 16. The testimony offered by the parties' children as to the carpets/rugs, while a bit more clearly stated, was nevertheless lacking the specificity required to conclude the location and/or value of the rugs/carpets.

17. The only clear testimony offered by the children related to details offered by their son[,] that Wife had removed certain rugs/carpets from the residence after separation, an allegation which Wife did not contest or rebut.

18. Neither the specific identity, nor the value of the rugs/carpets which Wife removed after separation were articulated.

19. No credible testimony was provided to support Husband's contention that he had purchased Wife jewelry during the marriage which had any ascertainable value.

Master's Report, 7/15/11, at ¶¶ 14-19.

In its Opinion adopting the Master's findings, the trial court stated the following:

The transcripts reveal four days of contentious hearings with numerous counsel. The Master had the opportunity observe the witnesses and evidence that he discredited or found credible. The record is replete with confusing, unclear, biased, and incredible evidence[,] as well as the lack of evidence or documentation. It bears out the Master's difficulty in ascertaining the values of the assets in order to calculate with reasonable certainty the aggregate value of the marital estate. The court agrees [that] in his findings, [the Master] appropriately allocated and valued the marital assets, calculated credits[,] or lack thereof[,] to the parties. The [trial] [c]ourt finds that [the] Master [], as the initial trier of fact and of credibility, did not abuse his discretion or commit an error of law.

Trial Court Opinion, 6/22/12, at 4-5.

Our review confirms the Master's findings, as adopted by the trial court. At the evidentiary hearing, Husband claimed that there were 12 or 13 carpets, which were purchased in Iran and shipped to Canada, or purchased in Canada, which were then brought to the United States. N.T., 10/16/09,

at 106, 107, 109-10. Husband presented only one document, identifying him as the purchaser, stating that he owed $50,000 for the carpets. *Id.* at 109. However, Husband then acknowledged that he purchased only some of the carpets, and that others were gifts from his father. *Id.* at 110-11. In explaining why his name appeared on the purchase document as the purchaser, Husband testified that when a purchase is made in Iran, the name of the intended recipient is placed on the receipt, not the name of the person who actually purchased the items. *Id.* at 118. Husband produced no documentation regarding the value of each carpet. *Id.* at 107.

At the hearing, Husband's expert, Tahir, testified that she had been to the parties' home at least 20 times over the years. N.T., 8/7/09, at 99. While there, she observed approximately 10 or 14 Persian carpets, of all sizes. *Id.* The parties' 18-year-old son, N.M., testified that when Wife left the marital residence, he helped her remove two or three carpets from the house. *Id.* at 216. N.M. could not recall what happened to the other carpets. *Id.*

The cross-examination testimony of Husband's expert, Tahir, was fraught with contradictions. Regarding the value of the Persian carpets, Tahir testified on cross-examination that she had inspected the carpets every time that she visited the residence, on her hands and knees. *Id.* at 122, 124-25, 132. However, Tahir later conceded that she did not get down on her hands and knees every time she visited the residence. *Id.* at 132.

During another exchange, Tahir stated that Wife "is cooked." *Id.* at 145-46.

Further, as Husband's valuation expert, Tahir refused to assign a fair market value to the Persian carpets:

> Q. [Wife's counsel]:  Now, you're talking about replacement value.  What if this carpet was sold on the open market, how much?
>
> A. [Tahir]:  I do not know where this case stands.
>
> Q.  Answer my question.  Do you have an opinion on how much this carpet would sell for on the open market?
>
> A.  Definitely.
>
> Q.  How much would it sell for on the open market?
>
> A.   It would sell according to who would like to buy it.  And obviously[,] when you are going with your sack on your shoulder, people are going to treat you accordingly.  When this is put into Bloomingdales where[,] obviously[,] people have a high price tag, they would pay for it.  If [Wife] put it on the shoulder and begged people to buy it, who will buy it.
>
> Q.  How much would the carpet be sold for in the open market[, the carpet] that is in Defendant's [Exhibit] 44 in the family room?
>
> A.  I can't answer that.
>
> Q.  How much would the carpet be sold for in the open market that is in Defendant's [Exhibit] 4 in the family room?
>
> A.  I will not answer any open market question because I have not been able to do it with something like that in the past.

*Id.* at 152-53.  Notably, Tahir was not qualified as a valuation expert as to the home's furnishings or jewelry owned by Wife.

When viewed in light of the credibility determination made by the Master, who discounted the testimony of Husband's expert in its entirety, we discern no error or abuse of discretion by the trial court in adopting the findings regarding the value of the personal property, and credibility determinations. **See Smith**, 904 A.2d at 20 (stating that the factfinder is entitled to weigh the evidence presented and to assess its credibility, believing all, part, or none of it); **Morgante**, 119 A.3d at 387 (stating that "a master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties."). Accordingly, we cannot grant Husband relief on this claim.

Based upon the foregoing, we affirm the Order of the trial court, which equitably distributed the parties' marital property.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/27/2017

- 12 -

IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
CIVIL DIVISION

| | | |
|---|---|---|
| MEHRNOSH MASSERRAT,<br>**Plaintiff/Appellee** | ) | No. 2006-FC-1453 |
| | ) | |
| | ) | |
| vs. | ) | **DIVORCE** |
| | ) | |
| ESMAEEL MASSERRAT,<br>**Defendant/Appellant** | ) | |
| | ) | |

**Pa. R.C.P. 1925 (a) Statement**

AND NOW, this 14ᵗʰ day of July, 2016, the undersigned enters the following statement

pursuant to Pennsylvania Rules of Appellate Procedure 1925(a):

On December 18, 2015, the Court entered a Divorce Decree in the above captioned case.

This Decree divorced the parties and stated that "the Court retains jurisdiction for enforcement of

all claims arising out of the Report of the Master in Divorce filed on July 15, 2011, the

Preliminary Order and Decree filed on June 22, 2012, the Report of the Master in Divorce filed

on February 2, 2015, the Order filed on July 29, 2015, and the Order dated December 18, 2015,

which reports and orders are incorporated into, but shall not merge with, this decree. On

December 18, 2015, the Court also entered an Order of Equitable Distribution. On January 14,

2016, Defendant/Appellant, Esmaeel Masserrat, timely filed a Notice of Appeal to the Superior

Court of Pennsylvania at Docket Number 186 EDA 2016 from the December 18, 2015, Order of

Equitable Distribution. By Order of Court dated January 15, 2016, Appellant was ordered to file

a Concise Statement of Matters Complained of on Appeal within twenty-one days of the Order.

On February 5, 2016, Appellant timely filed his Concise Statement of Matters Complained of on

Appeal.

Filed 8/31/2016 9:51:00 AM Superior Court Eastern District
186 EDA 2016

Received 8/31/2016 9:51:09 AM Superior Court Eastern District

In his Concise Statement of Matters Complained of on Appeal, Appellant raises six allegations of errors for the Court's consideration, which are reproduced here verbatim:

(a) The Trial Court committed an error of law and/or abuse of discretion in Finding of Fact (Pa.R.C.P. 1920.54) in assigning non existing credit to Defendant (No. 60-62 in Master report of July 15 2011, to which exceptions was filed by Defendant) and which has since been adopted by Honorable Judge Varricchio, in that Defendant delivered documents to the Master of Divorce showing that very little in the way of monies---due to trading losses was in this account at the time of separation. The sum in said account was no more than $49.00, yet credit of $25000.00 was assigned to Defendant.

(b) The Trial Court committed an error of law and/or an abuse of discretion in finding of Fact (Pa.R.C.P. 1920.54) in Master Report of February 2, 2015, page 4, last paragraphs, in which he gave credit of $62,000.00 to plaintiff for her payment of the home equity loan. Defendant alone made all contributions to maintaining the marital property while living together and made substantial contributions to preserving the marital real estate even after separation give[sic.] that he was charged with a mortgage deviation of around $450.00 dollars per month (which varied slightly) in the related domestic relations matter.

(c) The Trial Court committed an error of law and/or an abuse of discretion in Finding of Fact (Pa.R.C.P. 1920.54) in denying Defendant Fair Rental Credit for his portion of Marital home given that he had to rent separate living quarters. Defendant maintains that Plaintiff statement of abuse was totally unsubstantiated and the Assault case against the Defendant was dropped by the action of District Attorney and this fact has been ignored by trial court.

(d) Defendant also contends that he made other separate payments of taxes on the real property after separation, all of which he should be given credit for, in accordance to PA Rule 1910.16-6.

(e) The Trial Court committed an error of law and/or an abuse of discretion in Findings of Fact (Pa.R.C.P. 1920.54) in that marital home appraisal was done in Defendant absence and that his right to a fair appraisal and appeal process has been violated. (Motion April 29, 2015).

(f) The Trial Court committed an error of law and/or an abuse of discretion in Findings of Fact (Pa.R.C.P. 1920.54) Nos. 14-18 in Master Report of July 15, 2011, in that Defendant, both children and Defendant's expert, Shehnaz Tahir, testified that the home was expensively furnished with valuable original Persian carpets most of which was testified to have been immediately removed from the property after Wife had the Defendant evicted. Defendant should be entitled to at least $50,000 for the personal property that was in Wife's sole possession instead of the mere $2500.00 credit given to him for everything in marital home.

Appellant's Statement of Matters Complained of on Appeal Pursuant to Rule 1925 (b), ¶¶ (a)-(f). Appellant's issues (a), (c), (d), and (f) were raised in Appellant's prior appeal in this Matter at 2013 EDA 2012 which was quashed on September 13, 2012, as untimely by the Pennsylvania Superior Court. The Pennsylvania Superior Court denied Appellant's request for reconsideration of the September 13, 2012 Order of Court and Appellant's alternative request for allowance of appeal nunc pro tunc on October 25, 2012. The Court addressed the issues raised in the 2013 EDA 2012 appeal in its prior 1925 (a) statement dated August 20, 2012, by incorporating the reasons for its decision as set forth in the June 22, 2012, Memorandum Opinion and we now incorporate those opinions herein in their entirety. Additionally this Court is entering a supplemental opinion dated this same date further addressing the issues raised on appeal and the procedural history subsequent to the August 20, 2012, 1925(a) Statement which we incorporate herein.

BY THE COURT:

Michele A. Varricchio, J.

# IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
## CIVIL DIVISION

MEHRNOSH MASSERRAT,        )   No. 2006-FC-1453
          Plaintiff/Appellee     )
                                )
vs.                       )   DIVORCE
                                )
ESMAEEL MASSERRAT,          )
          Defendant/Appellant  )

Appearances:
    Mehrnosh Masserrat,
        Self-represented.

    Esmaeel Masserrat,
        Self-represented.

********

## MEMORANDUM OPINION

**MICHELE A. VARRICCHIO, Judge**

This Opinion is filed in support of our Order of December 18, 2015, fully and finally resolving the equitable distribution of the marital estate and any and all other economic claims that were raised or which could have been raised by the parties in this instant action, our Order of July 29, 2015, making adjustments to the Preliminary Order and Decree of June 22, 2012, our Order of May 27, 2015 resolving husband's exceptions to the Report of the Master in Divorce John E. Roberts, III dated February 2, 2015, and our Preliminary Order and Decree of June 22, 2012, and our Memorandum Opinion of June 21, 2012, resolving husband's and wife's exceptions to the Report of the Master in Divorce John E. Roberts, III dated July 15, 2011. This has been a long and protracted divorce case. Appellee, Mehrnosh Masserrat, hereinafter Wife,

4

filed the initial Complaint in Divorce asserting the ground of indignities on November 21, 2006, against Appellant, Esmaeel Masserrat, hereinafter Husband. The Complaint contained claims for equitable distribution of marital property, alimony pendent lite, post-divorce alimony, counsel fees, and costs and expenses.

Wife also filed a Petition for Special Relief on November 21, 2006, seeking that the parties' accounts be frozen to prevent the dissipation of assets. By Order of Court dated December 7, 2006, the Honorable Alan M. Black prevented the parties from dissipating or liquidating marital assets, but provided for the parties to use the funds for their reasonable and necessary living expenses. On March 7, 2007, Wife filed a second Petition for Special Relief seeking to prevent dissipation of marital assets and joinder of additional defendants. By Order of Court dated March 14, 2007, the Honorable Alan M. Black froze all accounts in the name of Husband and Wife, either individually or jointly, until further Order of Court or a marital settlement agreement, except that Husband was permitted to open a new account in his name alone for his paycheck to be deposited in. The March 14, 2007, Order of Court contained two other provisions relevant to Husband's appeal. The Honorable Alan M. Black further Ordered:

B. H., [Husband] under oath shall, within 20 days from the date of this order Defendant, a full and complete accounting of all funds transferred by him from the First Commonwealth Federal Credit Union from November 19, 2005 to the present, including but not limited to an accounting of the $100,000.00 wired by Defendant/Husband to TD Canada Trust on November 19, 2005, of the $40,000.00 transferred to Ameritrade on October 24, 2006, the $45,000.oo transferred to Ameritrade on October 26, 2006, the $1000.00 transfer from the First Commonwealth Federal Credit Union on November 20, 2006, the $7,009.65 transfer from First Commonwealth Federal Credit Union on November 21,2006, and the $28,000.00 transferred from First Commonwealth Federal Credit Union on April 7, 2005, and the $30,000 transfer from First Commonwealth Federal Credit Union on November 19, 1999. In this context, **Defendant/Husband shall provide William P. Bried, Esq. with true and correct copies of all First Commonwealth Federal Credit Union Account statements, Ameritrade**

**account Statements**, and TD Canada Trust Account statements, and any other account statements evidencing the deposit of said funds and disposition of said funds for the period from the date of each transfer of funds from First Commonwealth Federal Credit Union to the present. **H shall further account for gold and carpets which were allegedly purchased with $50,000...**
G. Upon receipt by both counsel of evidence that the Ameritrade Account has a value of not less than $85,000 each party shall receive a $5000 distribution from said Account.

Order of Court dated March 14, 2007 (Alan M. Black, P.J.)(emphasis added). Due to the March 14, 2007, Order of Court, the parties' assets have now been frozen for over nine years with the exception that subsequent Orders of Court have permitted the payment of certain professional fees and the 2011, 2012, and 2013 marital real estate taxes to be paid from the parties joint Ameritrade Account.

**Factual Background**

The parties, Iranian citizens, had separated on October 25, 2006, just two months shy of their twenty-first wedding anniversary, having married December 30, 1985. See Wife's Ex. 2 to Master's Report, 7/15/2011, Islamic Marriage Agreement; Master's Report, 7/15/11, Finding of Fact No. 50, 51). Following the Islamic marriage ceremony, the parties had a civil ceremony on January 6, 1986. See N.T. Vol.III, 10/16/09, at 8:15-17. It was the first marriage for each of them. See Master's Report, 7/15/11, Finding of Fact No. 60. At the time of the marriage, Husband was employed as an electrical engineer and Wife was a college student. See Wife's Ex.2 to Master's Report, 7/15/2011, Islamic Marriage Agreement. The marriage produced two children, both of whom have reached the age of majority. See Master's Report, 7/15/11, Finding of Fact No. 57.

Wife was born on July 29, 1961, and thus she is now fifty-four years of age. See *Id.* Husband is approximately fifty-five years of age. *Id.* Wife's Ex.2 (listing husband's age as 24

6

years on the Islamic Marriage Agreement in 1985). Husband is still an electrical engineer. Wife has an associate degree in business, a bachelor's degree in accounting, and obtained a Masters Degree in Business Administration after separation. See N.T., 6/26/09, at 141:22-142:14, 150:13-19(Wife obtained her accounting degree in April of 1997 and her MBA in May of 2009). Throughout the course of this litigation, both husband and wife have had periods of unemployment and different employers. See N.T. Vol.III, 10/16/2009, at 29:10-15; N.T. Vol.1., 6/26/2009, at 142:22-153:24, 156:7-18. It appears that neither party has served in the United States military. See Master's Report, Findings of Fact, ¶61.

At the time of the 2009 hearings in front of the Divorce Master, wife had an existing health condition and a lack of formal work experience which the Master found would give the Husband a superior ability to earn income and to acquire assets in the future. See Master's Report, July 15, 2011, at P.20. Husband contributed to Wife's education paying for her accounting classes at Mulhenberg College in exchange for Wife cooking, cleaning, cutting the grass, and everything else. See N.T. Vol.1, 6/26/2009, at 215:7-22. Husband's approximate annual income when he was employed with LSI was $125,000 a year. See Master's Report, 7/15/11, at ¶66. The Lehigh County Domestic Relations Section determined the parties' net monthly incomes to be $7,100 for Husband and $2800 for Wife. *Id.* ¶68. At the time of separation, October 26, 2015, Wife was caring for dependent minor child N.M. at the marital residence. See Interim Order of Court dated September 4, 2007, Lehigh County D.R. No. 06-021981.

## Procedural Background

Wife petitioned for the appointment of a Master on February 7, 2008. By Order of Court dated February 8, 2008, John E. Roberts, III, Esquire was appointed Divorce Master to hear all the parties' claims in this matter. A settlement conference was held April 20, 2008. Master's Report, 7/15/11 at ¶ 14. No settlement was reached. A second settlement conference was held on September 24, 2008. *Id.* ¶20. No settlement was reached. The Divorce Master held evidentiary hearings on June 26, 2009, August 7, 2009, October 16, 2009, and December 14, 2009, prior to issuing his first Report of the Master in Divorce on July 15, 2011. At the June 26, 2009, and August 7, 2009 hearings Wife was represented by Anne K. Manley, Esquire. At the October 16, 2009, and December 14, 2009 hearings Wife was represented by Holly Saadzoi, Esquire. Defendant was represented by Joseph P. Maher, Esquire at all four initial hearings. Leading up to the hearings, various discovery motions and motions for sanctions were filed by the parties and resolved.

Husband filed a Petition for Bifurcation of the divorce on March 31, 2010. After a hearing, this Court denied the petition on September 16, 2010. The Court denied Husband's motion for reconsideration on September 23, 2010, after husband failed to appear for the scheduled hearing on the Motion. Husband filed a Motion for Reconsideration on September 22, 2010, which was denied by Order of Court dated September 23, 2010. On July 15, 2011, the Divorce Master filed his initial Report. Both husband and wife filed exceptions to the Divorce Master's July 15, 2011 Report on August 24, 2011. A hearing was initially scheduled for September 16, 2011, but was continued at the request of the parties several times. The hearing on the parties' exceptions was held November 17, 2011. This Court denied the parties'

8

exceptions by Memorandum Opinion on June 21, 2012 and entered a Preliminary Order and Decree on June 22, 2012.

On July 24, 2012, Husband filed an untimely Notice of Appeal with the Pennsylvania Superior Court. The Appeal at 2013 EDA 2012 was quashed on September 13, 2012, as untimely. The Pennsylvania Superior Court then denied Appellant's request for reconsideration of the September 13, 2012 Order of Court and Appellant's alternative request for allowance of appeal nunc pro tunc on October 25, 2012.

Wife filed a Motion for Consideration on December 6, 2012, and after a hearing by Order of Court dated January 17, 2013, Wife was granted leave of Court to pay the 2011 and 2012, county, school, and township taxes due on the marital residence in the amount of $12,325.77 from the parties' TD Ameritrade Account. On July 5, 2013, Wife filed a Motion for Consideration seeking the Court's involvement in securing Husband's cooperation in resolving the QDROs for the parties' retirement funds. On August 15, 2013, Husband filed an Answer stating that he was overseas and would be unable to attend the hearing and alleging he had not received copies of Wife's Motions. Wife filed an Additional Motion for Consideration on August 29, 2013. After a hearing, by Order of Court dated October 1, 2013, the Court permitted Wife to pay the 2013 real estate taxes for the marital residence in the amount of $5747.57 from the parties' TD Ameritrade Account. By Order of Court dated October 4, 2013, the Court gave the Wife authority to obtain any and all information from Agere/LSI regarding Husband's retirement benefits.

On November 12, 2013, Husband filed a Motion for Consideration seeking to have the Wife sell the marital residence or pay Husband fair rental credit from the date of the Preliminary

9

Order and Decree, June 22, 2009. A hearing was scheduled on the Motion for Consideration for January 3, 2014. Husband filed a second Motion for Consideration and a Petition for Contempt on November 15, 2013, seeking credit for the real estate taxes on the marital residence paid in 2007, 2011, 2012, and 2013 and alleging that Wife had not been providing him with copies of the Motions she was filing with the Court. The January 3, 2014, hearing was continued to February 10, 2014. After the hearing, by Order of Court dated February 11, 2014, the Court denied Husband's Motions and Petitions, but remanded the case to the Divorce Master for further hearing after John T. Hand prepared the QDROs for the parties.

The Divorce Master conducted a hearing in this matter on July 31, 2014. The Divorce Master concluded that John T. Hand needed more information in order to complete the couple's QDROs and thus an Order of Court was entered on August 1, 2014, and August 8, 2014, seeking that Husband execute an authorization for information from his former employer in order to finish the QDROs. On February 2, 2015, the Divorce Master filed his Report. Husband filed exceptions to the February 2, 2015 Divorce Master Report on February 23, 2015. A hearing was held on Husband's exceptions on April 29, 2015. The QDROS were filed on April 29, 2015.

On April 30, 2015, Husband filed a Motion for Consideration seeking among other things a new assessment of the value of the marital residence or the opportunity to buy the marital residence from the Wife for the assessed value of $305,000. By Order of Court dated May 26, 2015, the Court denied Husband's Motion for Consideration and Overruled Husband's exceptions to the Master's Report. Also by Order of Court dated May 26, 2015, the Court ordered $14, 862.10 released from the TD Ameritrade Account for Wife to pay John T. Hand for his preparation of the QDROs, A.R. Ulans Realty for preparation of the appraisal of the marital

10

property, and to pay the 2014 and 2015, county, school, and township real property taxes. By Order of Court dated July 29, 2015, the Court recalculated based upon the Master's Report of February 2, 2015, the amount owed to Husband from the marital estate. The Court gave Wife ten days from the date of the July 29, 2015, Order of Court to submit to the Master of Divorce proof of payment of the 2010 real estate taxes.

On August 21, 2015, Husband filed a Complaint against Master of Divorce for Abuse of Discretion alleging that the Divorce Master should not have awarded Wife the $62,000 credit for paying off the mortgage on the marital property. Also on August 21, 2015, Husband filed a Complaint Against Master of Divorce for Non-Existent Credit alleging that the Divorce Master has ignored his documentation and relied on an erroneous statement about the $25,000 value of a second Ameritrade Account. On December 18, 2015, the Court entered a Divorce Decree in the above captioned case. This Decree divorced the parties and stated that "the Court retains jurisdiction for enforcement of all claims arising out of the Report of the Master in Divorce filed on July 15, 2011, the Preliminary Order and Decree filed on June 22, 2012, the Report of the Master in Divorce filed on February 2, 2015, the Order filed on July 29, 2015, and the Order dated December 18, 2015, which reports and orders are incorporated into, but shall not merge with, this decree." On December 18, 2015, the Court also entered an Order of Equitable Distribution. The instant appeal followed.

**Equitable Distribution Award**

When "determining the propriety of an equitable distribution award, courts must consider the distribution scheme as a whole." *Childress v. Bogosian,* 12 A.3d 448, 455(Pa. Super. 2011). Equitable distribution does not necessarily result in an equal division of marital property. *Platek*

11

*v. Platek,* 454 A.2d 1059, 1063 (Pa. Super. 1982). The Court is to "measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights." *Schenk v. Schenk,* 880 A.2d 633, 639 (Pa. Super. 2005)(citation omitted). Although it is ultimately "within the province of the trial court to weigh the evidence and decide credibility," the Master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties." *Childress,* 12 A.3d at 455; *Taper v. Taper,* 939 A.2d 969, 973-974 (Pa.Super. 2007). The objective of the Master is to achieve "economic justice" between the parties. *Balicki v. Balicki,* 4 A.3d 654, 663 (Pa.Super. 2010). However, despite the great weight that the master's report is entitled to, "it is the responsibility of the court to make the final equitable distribution." *Trembach v. Trembach,* 615 A.2d 33, 35 (Pa. 1992).

In making a determination as to the equitable distribution of property, the Court is to view the parties situation in light of the totality of the circumstances and to consider the following factors as set forth in 23 Pa. C.S.A. §3502:

(1) The length of the marriage.
(2) Any prior marriage of either party.
(3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties.
(4) The contribution by one party to the education, training or increased earning power of the other party.
(5) The opportunity of each party for future acquisitions of capital assets and income.
(6) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.
(7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker.
(8) The value of the property set apart to each party.

12

(9) The standard of living of the parties established during the marriage.
(10) The economic circumstances of each party at the time the division of property is to become effective.
(10.1) The Federal, State and local tax ramifications associated with each asset to be divided, distributed or assigned, which ramifications need not be immediate and certain.
(10.2) The expense of sale, transfer or liquidation associated with a particular asset, which expense need not be immediate and certain.
(11) Whether the party will be serving as the custodian of any dependent minor children.

23 Pa. C.S.A. §3502. Further, the Court is not to consider marital misconduct in making the equitable distribution. *Id.* "In determining the value of marital property, the court is free to accept all of the testimony, portions of the testimony, or none of the testimony regarding the true and correct value of the property." *Aletto v. Aletto*, 537 A.2d 1383, 1389 (Pa. Super. 1988) relying on *Gee v. Gee*, 460 A.2d 358 (Pa. 1983).

In this case, pursuant to the Preliminary Order and Decree dated June 22, 2012, the marital assets each party was to be credited with receiving are as follows:

| Wife's Marital Assets | | Husband's Marital Assets | |
|---|---|---|---|
| Interim Distribution | $5,000 | Interim Distribution | $5,000 |
| Nissan Maxima | $5,000 | Subaru Tribeca | $12,000 |
| Excess Value of Personal Property | $2,500 | Consideration for Toyota Camry | $3,000 |
| Cash from Bank Accounts | $47,000 | Wire Transfer Funds | $50,000 |
| | | Employee Stock Purchase Plan | $3000 |
| | | Funds from Joint Ameritrade Account | $25,000 |
| | | Intel Stock | $500 |
| Marital Assets in Wife's Possession: | $59,500 | Marital Assets in Husband's Possession: | $98,500 |

In addition to the $158,000 marital assets listed above, the Court also noted that the parties owned an additional joint Ameritrade Account with a balance of $86,000. Wife was to receive half of the Ameritrade Account if she elected to sell the marital residence. If instead she elected to purchase the Defendant's interest in the marital residence, then Husband was to receive the entirety of the $86,000 joint Ameritrade Account. The net equity in the marital residence was determined to be $323,275, and if the parties sold the residence, the net proceeds of the sale were to be divided with the Wife receiving 55% and the Husband receiving 45%. Thus the total value of the marital estate, not including Husband's Agere/LSI 401 (k) Plan, and Agre/LSI Defined Benefit Plan that were dealt with through separate QDRO orders, was $567, 275.

Following the subsequent hearings on the parties exceptions, the subsequent hearings in front of the Master and based upon the Order of May 26, 2015, overruling the Husband's exceptions to the Divorce Master's Report of February 2, 2015, the net equity of the marital residence was reduced to $232,325 based upon the March 2, 2015, appraisal listing the fair market value of the residence as $305,000 less 3.5% of the fair market value for potential costs of sale and less the $62,000 balance owed on the home equity loan at the time of separation. See Order of Court dated July 29, 2015. Husband was to receive 45% of the amount of real estate taxes paid by Plaintiff for 2011, 2012, 2013, 2014, and 2015 from the joint Ameritrade Account. *Id.* Based upon the change in the appraised fair market value of the marital residence and the Divorce Master's rulings about the $62,000 credit to wife for paying the home mortgage, and permitting Husband to recover 45% of the real estate tax payments for 2011, 2012, 2013, 2014, 2015, the Court determined that the total value of the marital estate subject to equitable division

14

was $473,400. *Id.* Husband's share of the marital estate equals $213,030. *Id.* Husband was credited with receiving $98,500 of the marital assets and is thus owed $114,530. *Id.* Pursuant to the December 18, 2015, Order of Court, Wife was to pay Husband $114,530 if she elected to retain the marital residence. If Wife was unable to make full payment to Husband, the marital residence was to be sold and Husband was to receive the first $114, 530 from the net proceeds of the sale. See Order of Court dated December 18, 2015.

**Matters Complained of on Appeal**

In his Concise Statement of Matters Complained of on Appeal, Appellant raises six allegations of errors for the Court's consideration, which are reproduced here verbatim:

(g) The Trial Court committed an error of law and/or abuse of discretion in Finding of Fact (Pa.R.C.P. 1920.54) in assigning non existing credit to Defendant (No. 60-62 in Master report of July 15 2011, to which exceptions was filed by Defendant) and which has since been adopted by Honorable Judge Varricchio, in that Defendant delivered documents to the Master of Divorce showing that very little in the way of monies---due to trading losses was in this account at the time of separation. The sum in said account was no more than $49.00, yet credit of $25000.00 was assigned to Defendant.

(h) The Trial Court committed an error of law and/or an abuse of discretion in finding of Fact (Pa.R.C.P. 1920.54) in Master Report of February 2, 2015, page 4, last paragraphs, in which he gave credit of $62,000.00 to plaintiff for her payment of the home equity loan. Defendant alone made all contributions to maintaining the marital property while living together and made substantial contributions to preserving the marital real estate even after separation give[sic.] that he was charged with a mortgage deviation of around $450.00 dollars per month (which varied slightly) in the related domestic relations matter.

(i) The Trial Court committed an error of law and/or an abuse of discretion in Finding of Fact (Pa.R.C.P. 1920.54) in denying Defendant Fair Rental Credit for his portion of Marital home given that he had to rent separate living quarters. Defendant maintains that Plaintiff statement of abuse was totally unsubstantiated and the Assault case against the Defendant was dropped by the action of District Attorney and this fact has been ignored by trial court.

(j) Defendant also contends that he made other separate payments of taxes on the real property after separation, all of which he should be given credit for, in accordance to PA Rule 1910.16-6.

15

(k) The Trial Court committed an error of law and/or an abuse of discretion in Findings of Fact (Pa.R.C.P. 1920.54) in that marital home appraisal was done in Defendant absence and that his right to a fair appraisal and appeal process has been violated. (Motion April 29, 2015).

(l) The Trial Court committed an error of law and/or an abuse of discretion in Findings of Fact (Pa.R.C.P. 1920.54) Nos. 14-18 in Master Report of July 15, 2011, in that Defendant, both children and Defendant's expert, Shehnaz Tahir, testified that the home was expensively furnished with valuable original Persian carpets most of which was testified to have been immediately removed from the property after Wife had the Defendant evicted. Defendant should be entitled to at least $50,000 for the personal property that was in Wife's sole possession instead of the mere $2500.00 credit given to him for everything in marital home.

Appellant's Statement of Matters Complained of on Appeal Pursuant to Rule 1925 (b), ¶¶ (a)-(f).

The Court will address each issue in order.

## A. $25,000 valuation of Trading Account

Husband argues that the $25,000 credit he received for the joint Ameritrade Account in the Master's report of July 15, 2011, was an abuse of discretion or error of law as the sum of money in the account was no more than $49.00 at the time of separation due to trading losses. Appellant's Concise Statement, ¶(a). Husband claims that he delivered documents to the divorce master that demonstrated that the value of the account was no more than $49.00 at the date of separation. *Id.* The Court notes that,

> The Divorce Code does not specify a particular method of valuing assets. Thus, the trial court must exercise discretion and rely on the estimates, inventories, records of purchase prices, and appraisals submitted by both parties. When determining the value of marital property, the court is free to accept all, part, or none of the evidence as to the true and correct value of the property. Where the evidence offered by one party is uncontradicted, the court may adopt this value even though the resulting valuation would have been different if more accurate and complete evidence had been presented.

*Childress*, 12 A.3d at 456, internal citations omitted, relying on *Biese v. Biese*, 979 A.2d 892, 897 (Pa. Super. 2009). Moreover, "the valuation date should be the one that best effects

16

economic justice between the parties." West's Pa. Practice: Family Law Practice and Procedure §22:4 (7th ed. 2008), *McNaughton v. McNaughton*, 603 A.2d 646 (Pa. Super. 1992). The party seeking to use a specific value or valuation date has the burden of proof. *Wellner v. Wellner*, 699 A.2d 1278 (Pa. Super. 1997). Additionally, if the valuation date used is not objected to at the time of the hearing, it will be upheld even though the date of distribution may be more appropriate. *Wellner*, 699 A.2d at 1283.

At the exceptions hearing on April 29, 2015, Husband set forth his position arguing that the Court accepted a $25,000 valuation for the Ameritrade Account based upon his statement,

> Which I believe I did not make. And I have pointed out several times that I did not—and this is saying that I accepted that the Ameritrade joint account has a value of $25,000. I believe I never said it. There are other statement[sic.] in the divorce proceeding where I said it's a value less than a 50 or 100. It was very low. So I don't really know why I got this false credit of $25,000. I never really had any money in that account. The singular account that I had transferred money to was from the beginning I declared it as a marital and it was-there was $85,000 in there, which the Court is aware of and some of the money has been used in that account. But the $25,000 never existed. I objected to the report right from the beginning that I really never had the $25,000 and this credit is false. I have provided documents to Master Roberts to show that that's the case. Now in his report, he's saying that this issue is too long back, but I don't think time is a matter of deciding whether an issue is correct or not, because people commit murder 30 years ago and they go to jail when they are caught. So time is not an issue, and conversely, people are freed from jail if they're found innocent.

See N.T., 4/29/15, at 37:21-38:21. Husband argued that he never withdrew any money from the account, but rather, "it was option trading so the option expired and the account became worthless. And that was around the PFA time…because all the options in the account had expired and I could not cash them out. It was just a risky business at that time." See N.T., 4/29/15, 44:6-21. Husband was first Ordered to turn over statements from the Ameritrade Account by Order of Court dated March 14, 2007. The Court has reviewed all the exhibits

presented to the Divorce Master by the Husband at the initial hearings on June 26, 2009, August 7, 2009, October 16, 2009, and December 14, 2009. None of the filed exhibits contains documentation revealing the value of the joint Ameritrade Account. The Divorce Master based his initial valuation of the account at $25,000 on the Husband's own statement during cross-examination:

> Master Roberts:     Mr. Masserrat, every answer you give shifts around to something else. I'm going to hold your feet to the fire on this. Go prove what you just said. Let's go on to the next point.
> By Ms. Saadzoi:
> Q. As of October 28, 2006, what was your Ameritrade account worth? …
> A.Which Ameritrade Account?
> Q. Both.
> A. I don't know. Probably the one that I joined the CD money to had $85,000. If by that time—they had a hold-up date. If by that date it was cleared, it would have been 85,000 for the account that was under my name. The other one, I don't know. Probably 20, or 30,000.

See N.T., Vol.III, 10/16/2009, at 238:10-239:2 (Husband answering questions). The Divorce Master's Report following the hearings was not entered until July 15, 2011, and yet Husband still did not provide any documentation as to the value of the Ameritrade Account at the time of separation.

At the July 31, 2014, hearing before the Divorce Master, Husband , in regards to the $25,000 valuation of the joint Ameritrade account stated that, "I have previously submitted to The Court, and I would do it again if you like, actual withdrawals and deposits into that account. And it would show that there was no—you missed that. You're not going to find—yet I think that's what's happening here. I should be given that, if I had $25,000 available to me from that account, there was no money in that account, more than $25." See N.T., 7/31/14, 67:20-68:1. At the conclusion of the July 31, 2014, hearing, Mr. Masserrat stated, "I think I owe two exhibits,

one is the statement of Ameritrade on the withdrawal from accounts…" *Id.* at 72:8-11. Divorce Master Roberts responded, "When you send me the documents, just highlight what you're talking about and send me a little cover sheet, explaining why you're sending it. Just explain it….It's part of the testimony you offered, so you want to give me documentation to illustrate that." *Id.* at 72:12-19. In his Report issued February 2, 2015, Divorce Master Roberts ultimately determined that after reviewing his July 15, 2011 Report and the underlying testimony, that it would be "unfair to both parties to re-open the record to address in sporadic fashion issues such as assignment of this asset to Defendant" as the issues were not adequately developed by counsel at the time of the original hearings, and the issue has already been litigated and decided. *Id.* at P.6-7.

Attached to Husband's Exceptions to Report/OREDR[sic.] of Master filed February 23, 2015, was a print out of the balances and positions of a TD Ameritrade Account listing the value of the account to be $49.56. Def.'s Exceptions, 2/24/15, Ex. E. The print out listed a date of August 23, 2014. *Id.* Husband has not provided sufficient documentation to overturn the earlier assignment of $25,000 to Husband for the joint Ameritrade Account. A balance from August of 2014, is not reflective of the value of the account at the time of separation in October of 2006. Despite numerous opportunities to submit such documentation, Husband failed to provide the documentation until after the Master's hearing on July 31, 2014. "In determining the value of marital property, the court is free to accept all of the testimony, portions of the testimony, or none of the testimony regarding the true and correct value of the property." *Aletto v. Aletto,* 537 A.2d 1383, 1389 (Pa. Super. 1988) relying on *Gee v. Gee,* 460 A.2d 358 (Pa. 1983). The Court did not abuse its discretion or commit an error of law by crediting Husband's own statement as

19

to the value of the second Joint Ameritrade Account at the time of the initial Master's hearing over the insufficient late documentation.

### B. $62,000 credit to Wife for payments of the Home Equity Loan

Next, Husband alleges that this Court committed an error of law or an abuse of discretion by accepting the Divorce Master's finding of fact in the Master's Report of February 2, 2015, which gave wife a credit of $62,000.00 for payment of the home equity loan. Appellant's Concise Stmt., ¶ (b). Husband argues that he alone made all contributions to maintaining the marital property during the marriage and made substantial contributions to preserving the marital real estate after separation based upon his $450.00 mortgage deviation he received in the related Domestic Relations Matter. *Id.* Wife had initially filed exceptions to the July 15, 2011, Report of the Divorce Master arguing that she had not been credited for post-separation payments made by Wife towards the home equity loan, taxes, and home insurance on the marital residence.

The Court notes initially that the $62,000 Home Equity Loan was a joint marital debt subject to equitable distribution under Pa.C.S.A. §3502. Under the June 22, 2012, Preliminary Order and Decree the net equity of the marriage residence was listed as $323,275.00 with the caveat that the Court was assuming no remaining liens against the home, which as a joint marital debt the Court would have deducted from the net equity if the property was sold before distributing the proceeds to the parties with Wife receiving 55% of the proceeds and Husband receiving 45% of the proceeds. The Master's Report of July 15, 2011, had estimated that the home equity loan balance was under $9000. Master's Report, 7/15/11, at P.9 ¶9.

At the April 29, 2015, hearing on Exceptions to the Master's Report, Husband stated that his biggest concern with the distribution was:

20

| Mr. Masserrat: | The biggest one is the credit of $62,000 down payment of the mortgage that she paid while she was in the house. And that was from the time of my eviction from the house until I believe March of 2010, when she paid the remaining of the mortgage and was in the house. |
| The Court: | So $62,000 down payment of the mortgage. |
| Mr. Masserrat: | She continued to pay the mortgage. |
| The Court: | Do you means in terms of down payment, you mean in the reduction of the – |
| Mr. Masserrat: | Reduction. |
| The Court: | Reduction, okay. |
| Mr. Masserrat: | So she paid it until it was done, around March of 2010. But I believe that the Pa. Code 231, 1910.16-6, it specifically puts it-I read it again: "The guidelines assume that the spouse occupying the marital residence will be solely responsible for the mortgage payment, real estate taxes and homeowner's insurance." And the word is "solely." So I believe it's her expenses because she wanted me evicted from the home. I had to go and find an alternate home myself. She's not paying any of that. I'm paying my place of residence, which at times included both of my children for a while and myself, and she was at home paying her own expenses, basically. |
| | And what is normally given in this situation is that if she wants me out, she has to pay the rent portion of what belongs to me. But because of the PFA, she didn't pay that. So my position is that provisions of PFA for her case has already been applied. I have been out of the house. I have been giving her full support based on what the Domestic Relations calculated, and as well as mortgage deviation on the home for the entire time. |

Notes of Testimony (N.T.), 4/29/15, at 27:16-28:21. The Court noted that Pa.R.C.P. 1910.16-6

(e) applies to calculations of child and spousal support guidelines. Husband further argued that

he believes to give the Wife the $62,000 credit would be double or triple dipping in that he

contributed to her living there through a mortgage deviation in the support case and based upon

his forfeiture of fair rental credit due to the Protection from Abuse Order. See N.T., 4/29/15,

29:5-30:4. Later during the exceptions hearing, Husband stated that, "I have no further argument

about the $62,000. I believe if she wants it she can have it but then I will be entitled to rent." See N.T., 4/29/15, 37:17-18.

The Divorce Master explained that in this case he found it, "appropriate to provide Plaintiff with credit for making the home equity loan payments in order to accomplish this end and so it is simply recommended that the equity in the home be calculated based upon the date of separation balance for the home equity loan and utilizing the current fair market value for the property. In that way, Plaintiff receives full credit for her pay-down of the mortgage but Defendant receives the benefit of the increase-in-value, if any, of the property considering changes in the real estate market to present date." Divorce Master Report, 2/2/2015, P.5. Further spousal support in this matter terminated on July 1, 2012. See Lehigh County DR-06-021981, PACSES Case Number 046108724. The case was closed after Husband paid the balance owing in October of 2012. *Id.* The $422.50 mortgage deviation was assigned when husband was paying child support for his son N.M. in September of 2007 and his son was living at the marital residence with Wife. See Interim Order of Court dated September 4, 2007, Lehigh County D.R. No. 06-021981.

The Home Equity Loan was a valid lien encumbering the marital property entered into by the Husband and Wife. Wife contributed to preserving the marital residence and in paying off the mortgage. While Husband is not entitled to fair rental credit for the marital home for reasons discussed below, Wife would normally be entitled to a downward adjustment in the rental credit for her share of the mortgage payments and related expenses. *Hutnik v. Hutnik*, 535 A.2d at 151 (Pa. Super. 1987). Here the Court was attempting to achieve economic justice between the parties by using the date of separation balance of the home equity loan and the current fair

market value of the marital residence. "The valuation date should be the one that best effects economic justice between the parties." West's Pa. Practice: Family Law Practice and Procedure §22:4 (7th ed. 2008), *McNaughton v. McNaughton,* 603 A.2d 646 (Pa. Super. 1992). The party seeking to use a specific value or valuation date has the burden of proof. *Wellner v. Wellner,* 699 A.2d 1278 (Pa. Super. 1997). Thus, the Court does not conclude that the Master abused his discretion in reducing the amount of the loan at the time of separation $62,000 from the equity of the Property to be distributed.

**C. Fair Rental Credit for Marital Home**

As referenced above, Husband argues that the Trial Court committed an error of law and/or an abuse of discretion in denying Husband Fair Rental Credit for his portion of Marital home given that he has rented separate living quarters for duration of this matter. Husband maintains that wife's statement of abuse was totally unsubstantiated and the assault case against the husband was dropped by the action of District Attorney and that this fact has been ignored by trial court. Appellant Concise Stmt., ¶c. The Court notes that, "it is within the sound discretion of the trial court to grant rental value as a part of equitable distribution." *Trembach v. Tremabach,* 615 A.2d 33, 37 (Pa. Super. 1992); *Hutnik v. Hutnik,* 535 A.2d 151 (Pa. Super. 1987); *Gee v. Gee,* 460 A.2d 358 (Pa. Super. 1983).

The basis of this award for rental value "is that the party out of possession of jointly owned property (generally the party that has moved out of the former marital residence) is entitled to compensation for her/his interest in the property." *Id.* at 37. Normally, "parties have an equal one-half interest in the marital property and thus the

disposed party will be entitled to a credit for one-half of the fair rental value of the marital home." *Lee v. Lee*, 978 A.2d 380, 385 (Pa. Super. 2009)(citations omitted). When considering the award of fair market rental credit, the Court is to engage in the following analysis:

> First, the general rule is that the dispossessed party is entitled to credit for the fair rental value of jointly held marital property against a party in possession of that property, provided there are no equitable defenses to the credit. Second, the rental credit is based upon, and therefore limited by, the extent of the dispossessed party's interest in the property. Generally, in regard to the marital home, the parties' have an equal one-half interest in the marital property. It follows therefore, that in cases involving the marital home that the dispossessed party will be entitled to credit for one-half of the fair rental value of the marital home. Third, the rental value is limited to the period of time during which a party is dispossessed and the other party is in actual or constructive possession of the property. Fourth, the party in possession is entitled to a credit against the rental value for payments made to maintain the property on behalf of the dispossessed spouse. Generally, in regard to the former marital residence, payments made on behalf of the dispossessed spouse will be one-half of the expenses including debt service on the property. This is so because equity places a responsibility for expenses to the extent of her/his ownership interest which is generally one-half. Finally, we note that whether the rental credit is due and the amount thereof is within the sound discretion of the court of common pleas.

*Trembach*, 615 A.2d at 37 (citations omitted).

However, the Pennsylvania Superior Court has concluded that, "equity prohibits Husband from receiving a monetary credit from Wife for the time that he was excluded by the PFA, as the order was entered on the basis of his misbehavior toward her. Thus, we agree with wife that husband was not entitled to any rental credit after the PFA was issued against him." *Lee v. Lee*, 978 A.2d at 388. Here, a temporary Protection from Abuse Order was entered on October 25, 2006, the date of the parties' separation, at Lehigh County No. 2006-PF-1001 against Husband and expressly evicted him from the marital residence at 5857 Winterberry Place, Allentown, PA

24

and Parkland Sr. High School, 2700 N. Cedar Crest Blvd, Allentown, PA. The protected parties of the temporary Protection from Abuse Order were Wife and one of the minor children, N.M.

By Order of Court dated November 2, 2006, a final Protection from Abuse Order was entered against husband by agreement of the parties, without admission of guilt or a finding of liability, and husband was excluded from the marital residence at 5857 Winterberry Place, Allentown, PA for the duration of the Protection from Abuse Order. By Order of Court dated May 27, 2007, the Final Protection from Abuse Order was amended by the Honorable Lawrence J. Brenner to reflect that the parties child N.M. was no longer a protected party under the Order, however, husband remained excluded from the Marital Residence. On May 2, 2008, Wife filed a Petition for an extension of the Protection from Abuse Order and a hearing was scheduled for May 8, 2008. After a hearing, by Order of Court dated May 8, 2008, the Final Protection from Abuse Order was extended to May 2, 2010, by the Honorable William E. Ford.

On April 12, 2010, Wife filed a Petition for an extension of the Protection from Abuse Order and a hearing was scheduled for April 20, 2010. After the hearing, by Order of Court dated April 20, 2010, the Final Protection from Abuse Order was extended to November 20, 2011, by the Honorable William E. Ford. Husband filed a Petition for Reconsideration of the April 20, 2010 extension on April 27, 2010. By Order of Court dated May 6, 2010, the extension Order entered April 20, 2010, was rescinded based upon Husband's Petition for Reconsideration. The Honorable William E. Ford ordered Wife's Petition for an extension of the Protection from Abuse Order be scheduled for a new hearing, and stated that the Order dated November 2, 2006, remained in full force and effect. After a hearing on August 31, 2010, by Order of Court dated

August 31, 2010, the Court reconsidered Wife's Petition for an extension of a Final Protection from Abuse Order and denied and dismissed Wife's petition for extension.

Thus, the Final Protection from Abuse Order excluding Husband from the marital residence expired on May 2, 2010. Therefore, Husband was excluded from the marital residence by the Protection from Abuse Order from October 25, 2006, until May 2, 2010, approximately 3 years, 6 months and 8 days, based upon his conduct that resulted in the issuance of the final protection from abuse order. Husband was evicted from the marital residence as a result of his own conduct prompting him to subsequently agree to the entry of the final Protection from Abuse Order. While Husband is correct that the criminal case arising out of the same incident that resulted in the October 21, 2006 temporary Protection from Abuse Order, was withdrawn by the District Attorney, Husband is ignoring the separate burdens of proof in criminal cases versus civil cases and the fact that despite his belief that "Plaintiff's statement of abuse was totally unsubstantiated," he agreed to enter into the Final Protection from Abuse Order which excluded him from the marital residence and he did not appeal that Order.[1] Appellant's Concise Stmt., ¶(c). This Court finds that the three year eviction pursuant to the agreed upon Protection from Abuse Order is an equitable defense to the general rule that the dispossessed party is entitled to credit for the fair rental value of jointly held marital property against a party in possession of that property and thus believes this contention of error is meritless.

Alternatively, separate and apart from the equitable defense to fair rental credit, "[w]hile each party is entitled to his or her equitable share of marital property, including the fair rental

---

[1] In a civil case, the burden of proof is only a preponderance of the evidence, whereas "[t]he acquittal of the criminal charges may have only represented "an adjudication that the proof was not sufficient to overcome all reasonable doubt of the guilt of the accused." *One Lot Emerald Cut Stones and One Ring v. U.S.,* 409 U.S. 232, 235 (1972), quoting *Helvering v. Mitchell,* 303 U.S. 391, 397 (1938).

value of the marital residence, the trial court need not compute that equitable share as a credit to the non-possessory spouse, as long as the total distributory scheme is equitable." *Schneeman v. Schneeman*, 615 A.2d 1369, 1377 (Pa. Super. 1992). The Court concludes that the overall total equitable distribution scheme as set forth in the July 29, 2015 Order of Court and December 18, 2015 Order of Court has achieved economic justice between the two parties.

### D. Failure to Receive Credit for Husband's Payment of Taxes on the Marital Property after Separation

Husband also claims that the Court has erred by not giving Husband credit for separate payments of taxes he made on the real property after separation. Appellant's Concise Stmt., ¶(d). Husband claims that he is entitled to this additional credit pursuant to Pa. R.C.P. 1910.16-6.[2] *Id.* It is permissible to award a party credit in equitable distribution for payment of the mortgage and taxes. *Trembach v. Trembach*, 615 A.2d 33 (Pa. Super. 1992). However, "since the court is required to consider a party's contributions in preserving an asset in the overall equitable distribution award, a specific credit may be denied." West's Pa. Practice: Family Law Practice and Procedure §22:6; *Schneeman v. Schneeman*, 615 A.2d 1369 (Pa. Super. 1992). Furthermore, post-separation voluntary payments for mortgages or utilities are not credits against equitable distribution unless the parties agreed to such a stipulation. *Middleton v. Middleton*, 812 A.2d 1241 (Pa. Super. 2002)(credit denied where payments were voluntary and credit would result in economic injustice.). It is improper to award a credit for post-separation payment of debt where an adjustment in support payments was made on account of the debt payment. *Goldblum v. Goldblum*, 611 A.2d 296 (Pa. Super. 1992).

---

[2] As was stated above, this Rule of Civil Procedure pertains to support actions.

27

Husband argued that he has paid $18,000 in taxes for the property and that he if he has to share in the tax burden of maintaining the marital real estate then he should recover the fair rental credit, the $62,000 mortgage reduction credit, or his payments on the taxes. See N.T. 4/29/2015, at 46:2-14. The Divorce Master in his February 2, 2015, Report did recommend that the Defendant receive a 45% credit for the real estate taxes paid from the parties joint funds after the time of separation. Divorce Master's Report, 2/2/15, P.7. He concluded that the real estate taxes paid for the 2006, 2007 tax years were close in time to the date of separation and so no further credits should be assigned related to the same. *Id.*

However, at the hearing, the Divorce Master considered Wife's argument that an account whose value was $16,000 at the date of separation was only credited as being $10,0000. See N.T., 7/31/14, at 36: 12-16. Husband testified and Wife agreed that the difference in value was due to husband's payment of real estate taxes for the 2006 year. See N.T., 7/31/14, at 58: 19-59:5. In retaining the value of the account as $10,000, Husband has essentially received a $6000 credit for paying the real estate tax in 2006. The Divorce Master found credible the Wife's testimony that she paid from her own funds the real estate taxes for 2008, 2009, and 2010. See Divorce Master Report, 2/2/15, P.7. The Divorce Master determined that the 2011-2013 real estate taxes were paid from the parties' joint Ameritrade account. *Id.* Based upon his award to the Wife of $62,000 credit for paying down the home equity loan, "and because the Protection from Abuse Order had expired at the time the funds were removed from the joint Ameritrade Account to pay the 2011-2013 real estate taxes, Defendant should receive a credit for the forty-five percent (45%) of the Ameritrade funds so utilized." *Id.* The Master recommended that the Defendant should receive such a credit when final calculations are made as to the marital estate

and equitable division of same. *Id.* The Court confirmed the Master's recommendations as reasonable and does not believe that it erred in refusing to reimburse Husband in full for the Real Estate tax payments.

### E. Martial Home Appraisal conducted without Husband being Present

Additionally Husband contends that this Court erred in permitting the marital home appraisal to be conducted in his absence and by an appraiser, he did not choose. Appellant's Concise Stmt., ¶(e). Husband claims that his right to a fair appraisal and appeal process has been violated in the Court's denial of his April 29, 2015 Motion. *Id.* Divorce Master Roberts had requested that the house be re-appraised and Wife claimed that he had identified a specific appraiser. See N.T. Vol.I, 4/29/15, 47:18-20; 50:17-51:1. Wife contacted the appraiser and had an appraisal done on March 2, 2015, and presented the Court with a copy at the April 29, 2015, hearing. See N.T. Vol.I, 4/29/15, at 47:13-49:10. After reviewing the appraisal, Husband objected to the value assigned to the home of $305,000 as being too low. *Id.* at 49:19-50:1. Husband argued that it was not fair that he was not able to have input into whom the Divorce Master chose to appraise the home. *Id.* at 50:14-15.

The parties were first Ordered to make arrangements for a joint appraisal as to the fair market value of the 5857 Winterberry Place marital residence in March of 2008. Order of Court dated March 14, 2008 (William E. Ford, J.). The Order stated that, "the parties shall not be bound by the conclusions reached by the appraiser as to the value of the property." *Id.* An initial appraisal was done on the marital residence on May 9, 2008 and was updated in December of 2008, by Rudolph G. Amelio, Jr. See Wife's Ex.1, to July 15, 2011 Divorce Master Report. The December of 2008 appraisal listed the fair market value of the marital residence as $350,000.

Mr. Amelio was the first witness at the June 26, 2009, hearing in front of the Divorce

Master. Mr. Amelio came to the marital residence for appraising the home, May 9, 2008, and

December 15, 2008. See N.T., 6/26/2009, at 7:10-18. When Mr. Amelio first went to the

residence in May of 2008, he believed he was there "as a result of a court order whereby the

parties agreed to have the marital home appraised." See N.T., 6/26/2009, at 7:19-22. Husband

and his attorney were unaware of the second appraisal that was conducted in December of 2008.

See N.T., 6/26/2009, at 8:22-24. Attorney Maher for Husband made the following objection at

the Master's hearing:

MR. MAHER:    Before we proceed further, I want to raise an issue here, because I wasn't involved as counsel for the defendant in the first appraisal. My understanding is that my client was supposed to have known about these appraisals and participate. And I'm not arguing necessarily about the first one.

But the second one I was involved here, and I never heard anything about a second appraisal being done on the property.
So in some ways I'm objecting to this because it was supposed to have been the joint undertaking, and there was no joint in this undertaking.

MRS. MANLEY:    Well, that was with respect to the first appraisal. Any party has a right to have any appraisals done and present, you know, that appraisal at a master's hearing.

MASTER ROBERTS:    The first appraisal was a joint undertaking?

MRS. MANLEY:    That's correct, there was a court—

MR. MASSERRAT:    No, it wasn't.

MR. MAHER:    My understanding, first of all, that it wasn't joint, because apparently he and his attorney at the time were not contacted.

But as to my situation, my understanding is that when we had a conference on this back in I think it was August or September, I stipulated to the appraisal here [May 2008]. I never knew that there was a second one.

If I had known that this was open ended as to ongoing appraisals, then we might have had—you know, I feel undue prejudice before he gives any numbers or anything here.

MASTER ROBERTS:    All right. That's fair. It's a fair point, if you haven't seen it before. But I think the thing to do is, we all knew it was being appraised, and knew it was being appraised by him. For the update, if you want, we can leave the record open, and I'll let Mr. Masserrat get his own

> appraisal if he wants and bring somebody in on a different day. No
> problem….To the extent the objection—I understand his objection, it's a
> fair one. It's overruled. But I'm going to give him leeway as far as getting,
> you know, something to fire back with.

See N.T., 6/26/2009, 8:15-11:13. Mr. Amelio found the home to be in "above average" or "good to very good" both times that he went to the residence. See N.T., 6/26/2009, at 15:4-25. He stated that the fair market value of the residence had been impacted by the declining real estate market. See N.T., 6/29/2009, at 16:3-4. Mr. Amelio's appraisal from May of 2008, listed the fair market value of the home at $365,000, his December of 2008 appraisal listed the fair market value of the home at $350,000. See N.T., 6/29/2009, at 20:20-21:2.

At the hearing, Mr. Amelio updated his December of 2008 appraisal, testifying about two new comparable home sales that he had pulled up in June of 2009 in advance of the hearing, that would lower his appraisal to "Probably in the mid 330's. I would say if I had—sticking a gun to my head today, probably 335." See N.T., 6/29/2009 at 20:10-12. The July 11, 2015, Divorce Master Report found that the fair market value of the marital residence in the Summer of 2009 was approximately $335,000 noting that,

> At the time of the first Hearing, an objection was raised as to the
> testimony provided by Rudy Amelio, Jr. as to the value of the real property at
> issue. Husband was provided with an opportunity to obtain his own appraisal for
> the property and the report was left open for the purpose. Husband provided no
> appraisal in opposition to that offered by Wife and so there was no position taken
> by Husband as to the value of the home other than the cross examination of Mr.
> Amelio by Husband's counsel.

See Master's Report, P.10, ¶10, n.3. Husband had two years from the date of the first hearing to the date of the filing of the Master's Report in July of 2011, yet he did not act to obtain an independent appraisal of the property. The Preliminary Order and Decree dated June 22, 2012, lists the net equity for the residence to be $323, 275.00, which was to be divided 55/45 after

paying off the home equity loan once liquidated unless the wife opted to buy out the husband's interest in the marital residence.

In his February 2, 2015, Report, the Divorce Master stated that an updated appraisal of the marital residence would be necessary, because "[u]tilizing the current fair market value is deemed appropriate in that the value for the real property in this matter utilized in the Master's Report was based upon an appraisal performed during the Summer of 2009, almost five and one-half (5 ½) years ago and so not necessarily indicative of such value of the property at the time same will be distributed between the parties." Divorce Master Report, 2/2/15, P. 5. The March 2, 2015, appraisal was conducted by Constance Ulans from A.R. Ulans Realty. She found the property to be in fair to average condition. Ulan's Appraisal, P.1. Some property defects listed were: "In the master bath, ceiling is water stained. Also the wall at the 2nd floor foyer area is water stained….Per the client, kitchen ranger burners not working, as well as, dishwasher and disposal. There are several cracks in the kitchen tile floor. The wall/wall carpeting is thread bare in several areas. (see photos) Carpeting needs replacing." *Id.* The three home sales the appraiser used in determining the appropriate sale price for the marital residence were homes within 1.25 miles of the marital residence and they sold for $385,000, $335,000, and $338,000. *Id.* at P.2. The appraiser determined that each of the three comparable homes were superior in condition and thus deducted between $38,000 and $33,000 from the sale price. *Id.* The appraiser also made other deductions from the sale's price based upon "other variations in price occurred by site size, seller concessions, lack of finished basement, number of baths." *Id.* Based on these variables, the appraiser concluded that the indicated value of the marital residence utilizing the comparison approach was $305,000. *Id.*

The Court acknowledged appointing Constance Ulans in its July 29, 2015, Order of Court which stated, "[t]he Court having appointed Constance Ulans to perform an updated fair market value appraisal of the prior marital residence located at 5857 Winterberry, Place, Allentown, Lehigh County, Pennsylvania, based upon receipt of Mrs. Ulans' appraisal and its adoption as part of the record in these proceedings, Ms. Ulans is awarded the amount of $375.00 for payment of professional services rendered." Thus, as Ms. Ulans was court appointed, rather than chosen independently by Wife to perform the appraisal, Husband has not been harmed by the lack of opportunity to present an updated independent appraisal. Husband initially had two years to obtain an independent appraisal in this matter before the Divorce Master entered his July 11, 2015 Report. In the interest of judicial economy and resolving this case, the Court concluded that the court appointed appraiser had adequately represented the Spring 2015, fair market value of the marital residence, rather than leaving the record open for both parties to obtain independent appraisals.

In *Wingard v. Wingard,* the Court of Appeals of Ohio found that the trial court had not erred in using the court-appointed appraisers in valuing the marital residence as their appraisal was the most current of the appraisals offered to the court and it included improvements made to the property. 2005-Ohio-7066 (Ohio Ct. App., December 30, 2005); *Cmwlth. v. Nat'l Bank & Trust Co.,* 364 A.2d 1331, 1335 (1976)("[w]hile it is a truism that decisions of sister states are not binding precedent on this Court, they may be persuasive authority.")(citations omitted). Here, Ms. Ulans updated appraisal provided the Court with information about the normal wear and tear that had occurred to lower the condition of the home from above average condition to fair to average condition in the five and a half years between the June 26, 2009 hearing and the

July 29, 2015 Order of Court. The updated appraisal also informed the Court of three comparable sales close by the marital residence much closer in time to the proposed distribution date than the original appraisals.

Husband was initially provided with the right to supplement the record with an independent appraisal. He failed to do so. Now, four years later, it was not an abuse of discretion for the Court to rely on a neutral Court appointed appraiser for an updated fair market value for the marital residence.

### F. Valuation of Personal Property in the Residence

Husband argues that he should be entitled to a credit of at least $50,000 instead of the $2500.00 credit given to him in the Master's Report of July 15, 2011, Findings of Fact 14-18 for the expensive original Persian Carpets that his expert, Shehnaz Tahir, testified were removed from the property after Husband's eviction. Appellant's Concise Stmt., ¶(f). Husband claims that he, both children, and Shehnaz Tahir, testified to the existence and value of these carpets. *Id.* The Court adequately addressed this issue in our Memorandum Opinion of June 21, 2012.

### Conclusion

This Court finds that the Divorce Master did not commit an error of law or an abuse of discretion in his equitable division of the parties' marital assets. The Court notes that when Husband filed his Pre-trial Statement on December 1, 2008, in his proposed resolution of the economic issues he averred that, "[d]efendant [husband] is willing to settle for a 54/46 (Plaintiff/Defendant)[Wife/Husband] division of these assets." Appellant's Pretrial Statement, ¶11. Ultimately, the Divorce Master recommended a division of assets that was only one percentage point different, awarding 55% of the marital assets to Wife and 45% of the marital

34

assets to the Husband. In light of the factual complexity and the protracted nature of these proceedings, as well as the voluminous testimony and exhibits received by Divorce Master Roberts, the Court finds it appropriate to give the fullest consideration to the Divorce Master's Reports, particularly on the question of credibility of witnesses. After an independent review of the record and evidence, the Court concludes that the Master's Findings as to what qualified as "marital property" and his valuation of the marital estate and his recommendation concerning equitable distribution achieved overall "economic justice" between the two parties. Thus, the Court finds Husband's contentions of error to be meritless.

At the last hearing in front of the Court, Wife inquired, "Your Honor, do you think we'll be divorced soon, before they roll me in a wheelchair to the nursing home?" See N.T., 4/29/15, 58:8-9. Husband echoed the Wife's frustrations stating at the February 10, 2014 hearing in front of this Court, " It's been eight years now, as you mentioned, that I have not gotten a penny of my marital asset[sic.]. So I'm asking Your Honor to do something so that she [the wife] has an incentive to move in this case." See N.T., 2/10/14, 35:23-36:3. This Court is hopeful that now after ten years of litigation this appeal will finally resolve the parties concerns over equitable distribution and will permit the parties to live separate fulfilling lives.

Date: July 14th, 2016            BY THE COURT:

                                 _____
                                 Michele A. Varricchio, J.

35